UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHARLES SCHWAB & CO., INC., )   )
Plaintiff, )   )
v. )   Case No. 1:15-cv-01148-TWP-DKL   )
THOMAS STALEY, and )
J.P. MORGAN SECURITIES LLC, )   )
Defendants. ) | |

### ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65(a) by Plaintiff Charles Schwab & Co., Inc. ("Schwab") (Filing No. 8). On July 22, 2015, Schwab filed its Complaint for injunctive relief against Defendants Thomas Staley ("Mr. Staley") and J.P. Morgan Securities LLC ("J.P. Morgan"), asserting claims for breach of contract, misappropriation of trade secrets, and tortious interference with contractual and business relationships (Filing No. 1). These claims will be arbitrated before the Financial Industry Regulatory Authority ("FINRA") because Schwab and J.P. Morgan are member firms of FINRA, and they have agreed and are obligated to arbitrate the claims before the FINRA. However, FINRA procedural rules require that any request for temporary or preliminary injunctive relief must be brought in a court of competent jurisdiction. Thus, Schwab filed its Motion for Preliminary Injunction in this Court.

Schwab seeks a preliminary injunction (1) prohibiting Mr. Staley (a former employee of Charles Schwab) and J.P. Morgan (Mr. Staley's current employer) from using or disclosing Schwab's confidential and trade secret information, (2) requiring Mr. Staley and J.P. Morgan to return all Schwab materials in their possession to Schwab, (3) prohibiting Mr. Staley from

soliciting Schwab clients he serviced or about whom he had continuing access to confidential information, and (4) prohibiting J.P. Morgan from causing or assisting Mr. Staley in soliciting Schwab clients who Mr. Staley serviced or about whom he had continuing access to confidential information. For the following reasons, the Court **DENIES** Schwab's Motion for Preliminary Injunction.

## I. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). Granting a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and quotation marks omitted). When a district court considers whether to issue a preliminary injunction, the party seeking the injunctive relief must demonstrate that:

> (1) it has a reasonable likelihood of success on the merits of its claim; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if preliminary injunctive relief is denied; (4) the irreparable harm it will suffer without preliminary injunctive relief outweighs the irreparable harm the nonmoving party will suffer if the preliminary injunction is granted; and (5) the preliminary injunction will not harm the public interest.

*Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc., 549 F.3d 1079, 1086 (7th Cir. 2008).*

## II. BACKGROUND

Mr. Staley worked as a portfolio consultant for Schwab for almost nine years from May 2006 to January 2015. When he began his employment with Schwab in May 2006, he signed a confidentiality and non-solicitation agreement. During his tenure at Schwab, Mr. Staley signed

2

additional confidentiality and non-solicitation agreements. Each of those agreements required Mr. Staley to not solicit Schwab's clients and to also safeguard Schwab's trade secrets, including client contact information.

The most recent confidentiality and non-solicitation agreement was electronically signed and acknowledged by Mr. Staley on September 28, 2012. Under the terms of the 2012 agreement, Mr. Staley agreed to not directly or indirectly solicit Schwab's clients while he worked for Schwab and for eighteen months after his employment with Schwab ended. The 2012 agreement specifically explained that solicitation includes initiating contact with Schwab clients for the purpose of notifying them of Mr. Staley's new or subsequent place of employment or for the purpose of encouraging or inducing the clients to transfer their accounts to Mr. Staley's new firm.

A managerial position became available at Schwab and Mr. Staley was interested in the position. On August 15, 2014, one of the managers informed Mr. Staley that, in their opinion, he was not ready to apply for the managerial position. Mr. Staley was disappointed. In light of the managers' opinion, Mr. Staley was discouraged from applying for the managerial position.

A few days later, on August 19, 2014, Mr. Staley accessed 115 client accounts. He typically accessed 20–40 client accounts per day. He accessed the client accounts using Schwab's secure Client Central Database, which contains confidential client information. From approximately 9:00 a.m. to 11:00 a.m. and 1:30 p.m. to 2:00 p.m., Mr. Staley retrieved account information for 93 clients by accessing the client overview screens. As Schwab describes them, these overview screens effectively provide a "one stop shop" for Schwab financial consultants to learn the details about a particular client, including date of birth, mother's maiden name, driver's license number, telephone number, email address, account numbers, account balances, and even passwords in some instances. Schwab argues that the fact that Mr. Staley was accessing these

overview screens in such an increased, rapid fashion suggests he was either writing down contact information or using his telephone to capture that same information.

On September 26, 2014, Mr. Staley printed a document listing 71 Schwab clients assigned to him and the market value of some of their accounts. Schwab asserts that there is no apparent business purpose for Mr. Staley to create and print this document. However, at page three of Exhibit 15, Mr. Staley explains that he does not have a copy of this document and that he printed and used the document in the ordinary course of his work. It was printed on the day that Janus Capital announced that Bill Gross was leaving Pacific Investment Management Company ("PIMCO") to work for Janus Capital, and the Schwab clients listed on the document had investments with PIMCO. Mr. Staley printed the document because he wanted to prepare a response for the clients who were invested in PIMCO.

On October 1, 2014, Mr. Staley printed multiple versions of his resume from his Schwab computer account. Then on October 9, 2014, Mr. Staley printed an Excel spreadsheet containing the historical statistics of his assigned practice. The spreadsheet contained information on the number of households in his practice, the percentage of discretionary investments made by clients in his practice, the total market value of the assets managed for his practice group, the number of new enrollments, the average client tenure, and the average market value for clients in the practice group. The spreadsheet also listed the names of five other Schwab employees in the practice group.

Similar to his high level of activity on Schwab's Client Central Database on August 19, 2014, Mr. Staley accessed 130 client accounts on October 29, 2014. Between approximately 2:40 p.m. and 4:00 p.m., Mr. Staley accessed account information for 114 Schwab clients in rapid succession. Virtually all of the client information that Mr. Staley accessed in that time period consisted of client overview screens.

At some point in October 2014, Mr. Staley had conversations with J.P. Morgan about potential employment opportunities at J.P. Morgan. In late October and early November 2014, Mr. Staley provided application materials to J.P. Morgan and began interviewing with J.P. Morgan managers. On November 19, 2014, J.P. Morgan formally presented an employment offer to Mr. Staley. Starting on December 8, 2014, Mr. Staley took four weeks of leave under the Family Medical Leave Act for the birth of his child. When he returned to work at Schwab on January 8, 2015, he notified Schwab that he was resigning to go to work for J.P. Morgan. Mr. Staley was reminded of his continuing obligations to Schwab, including those set forth in the 2012 confidentiality and non-solicitation agreement.

Approximately five months after Mr. Staley left Schwab, on June 9, 2015, Vic Kovachevich ("Mr. Kovachevich"), a Schwab financial consultant, met with two Schwab clients, Mr. and Mrs. L.[1] During the meeting, Mr. and Mrs. L told Mr. Kovachevich that they had recently received a telephone call from a representative of J.P. Morgan inquiring whether they would be interested in working with their former consultant from Schwab. Schwab asserts that Mr. and Mrs. L also told Mr. Kovachevich that they asked follow-up questions of the J.P. Morgan representative and were told the consultant was Mr. Staley.

Following the preliminary injunction hearing, Schwab and Mr. Staley each designated deposition testimony from J.P. Morgan employees Parveen Sultana ("Ms. Sultana") and Qamil Dervishi ("Mr. Dervishi") to provide additional evidence regarding J.P. Morgan's communications with Mr. and Mrs. L. This evidence shows that in June 2014, Ms. Sultana, a J.P. Morgan private

---

[1] At one point, Mr. and Mrs. L had been enrolled in the Schwab Private Client program, which provided them with an assigned financial consultant and portfolio consultant. When they were enrolled in the program, Mr. Kovachevich was Mr. and Mrs. L's assigned financial consultant and Mr. Staley was their portfolio consultant. On or about November 11, 2014, Mr. and Mrs. L ended their enrollment in the Schwab Private Client program, so Mr. Staley no longer serviced Mr. and Mrs. L. Since November 11, 2014, Mr. Kovachevich has been the only Schwab consultant assigned to assist Mr. and Mrs. L.

5

client banker, met with Mr. and Mrs. L. At that time, Mr. and Mrs. L had an existing bank account with J.P. Morgan and had an existing banking relationship with Ms. Sultana. Ms. Sultana invited Mr. and Mrs. L to meet with her and Mr. Dervishi, a former Schwab employee who is now a J.P. Morgan private client advisor, to discuss J.P. Morgan's private client investment opportunities. Mr. and Mrs. L informed Ms. Sultana and Mr. Dervishi that they had investment accounts with Schwab, that they wanted to give those accounts time to progress, and that they were open to a follow-up conversation about private client investment opportunities with J.P. Morgan the following year.

In late 2014 or early 2015, J.P. Morgan contacted Mr. and Mrs. L again, but they were out of the country and would not be able to talk until later in the year when they returned to the United States. Then in June 2015, Mr. Dervishi contacted Mr. and Mrs. L to follow up with them regarding J.P. Morgan's private client investment opportunities. No investment changes were made following the conversation and Mr. and Mrs. L continue to have their investment accounts with Schwab.

### III.     DISCUSSION

In order to obtain a preliminary injunction, Schwab must show that it has a reasonable likelihood of success on the merits of its claim, that no adequate remedy at law exists, and that it will suffer irreparable harm if a preliminary injunction is denied. If the court determines that Schwab has satisfied each of the three threshold requirements, it then proceeds to the balancing phase of the analysis; that the irreparable harm it will suffer without preliminary injunctive relief outweighs the irreparable harm Mr. Staley and J.P. Morgan will suffer if the preliminary injunction is granted, and that the preliminary injunction will not harm the public interest. *Platinum Home Mortg. Corp.*, 149 F.3d at 726.

Contemporaneous with filing the Motion for Preliminary Injunction, Schwab filed and was granted a motion for expedited discovery. In both declaration testimony and at the hearing, Mr. Staley testified that he does not have documents with Schwab's clients' information, he never had such documents, he has not given documents or information about Schwab's clients to J.P. Morgan, he does not have Schwab's clients' information on his personal electronic devices, and he did not at one point have the information and then deleted the information. Mr. Staley also asserts that he has not communicated with his former clients at Schwab since he left the company, and he has not asked anyone at J.P. Morgan to communicate with his former clients. Furthermore, he is not servicing any of his former clients. (Exhibit 15.) And, Mr. Staley and J.P. Morgan did not announce his new employment to his former clients.

Schwab considers the Excel spreadsheet information printed by Mr. Staley on October 9, 2014 to be highly confidential and proprietary. However, because the document did not contain clients' personal information and only showed statistics, Mr. Staley claims that he believed this information was typically shared as standard practice as part of the application materials when applying for employment with other financial institutions. He did later provide this Excel spreadsheet to J.P. Morgan as part of his application materials.

As for the 130 client accounts assessed on October 29, 2014, similar to his response regarding the information accessed on August 19, 2014, Mr. Staley explains that he does not have documents with Schwab's clients' information, he never had such documents, he has not given documents or information about Schwab's clients to J.P. Morgan, he does not have Schwab's clients' information on his personal electronic devices, and he did not at one point have the information and then deleted the information.

The Court agrees that Mr. Staley's actions are suspicious. He does not recall the excessive assessment of Schwab client accounts around the time of his departure, but he does not dispute the forensic evidence that he assessed the accounts. Schwab has presented circumstantial evidence that Mr. Staley may have misappropriated its client information and client prospect information and this information may qualify for trade secret protection under the Indiana Uniform Trade Secrets Act. Ultimately, the circumstantial evidence may be sufficient to show likelihood of success on the merits of Schwab's claim. However, because Schwab has not shown that it will be irreparably harmed, or that traditional legal remedies would be inadequate; the Court need not make a final determination on this prong.

Schwab asserts that Mr. Staley is soliciting its clients by having J.P. Morgan solicit Schwab's clients. Upon review of the facts noted above, the parties' arguments, and the evidence, the Court is not satisfied that Schwab has met its burden of showing that it will suffer irreparable harm without a preliminary injunction. Schwab has made broad, conclusory statements that it has suffered or will suffer a loss of customer goodwill and misuse of trade secret information. But, the only example of loss is a possible loss of customer goodwill related to Mr. and Mrs. L. The evidence shows that Schwab actually has not lost anything. Schwab has lost no clients, and it has not lost the goodwill of Mr. and Mrs. L as they remain Schwab customers and there is no likelihood of losing clients as a result of any breach of Mr. Staley's contractual obligations to Schwab.

Schwab also argues that irreparable harm lies in the fact that its clients expect their identities, their financial information, their market transactions, and their investment assets to be treated confidentially. Schwab asserts that if Mr. Staley is not required to return any client information in his possession, and is permitted to continue to misuse that information, each client's sensitive personal and financial information will lose its confidentiality. However there is

insufficient evidence to show misuse of confidential information or trade secrets. The only information taken from Schwab's information bank and shared with J.P. Morgan is Mr. Staley's historical practice statistics. Schwab believes the performance management report that Mr. Staley shared with J.P. Morgan is very confidential as it is not only about Mr. Staley's statistics, score and rankings but also rankings of his colleagues. But it appears that the information was used only in the hiring process when J.P. Morgan was considering offering employment to Mr. Staley. Concerning Schwab's client information, Mr. Staley and J.P. Morgan deny having such information, so they cannot misuse it.

Given that Schwab has not lost any clients or goodwill or customer trust, any injury that Schwab has suffered is compensable in the form of damages, which it can obtain in the parallel FINRA arbitration between the parties. For the same reasons that Schwab cannot demonstrate irreparable injury, it also cannot demonstrate that traditional legal remedies would be inadequate without a preliminary injunction.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Schwab's Motion for Preliminary Injunction ([Filing No. 8](#)). The Court notes that this Order does not give license to Mr. Staley to breach his agreements with Schwab nor allow J.P. Morgan to interfere with Mr. Staley's contractual obligations to Schwab. Mr. Staley's contractual obligations to Schwab must still be honored.

**SO ORDERED.**

Date: 9/22/2015

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ronald W. Buchmeier
BLACKWELL, BURKE & RAMSEY, P.C.
rbuchmeier@bbrlawpc.com

Thomas Barlow Blackwell
BLACKWELL, BURKE & RAMSEY, P.C.
tblackwell@bbrlawpc.com

John F. Marsh
HAHN LOESER & PARKS LLP
jmarsh@hahnlaw.com

Kari R. Roush
HAHN LOESER & PARKS LLP
kroush@hahnlaw.com

Amanda L.B. Mulroony
HOOVER HULL TURNER LLP
amulroony@hooverhullturner.com

Andrew W. Hull
HOOVER HULL TURNER LLP
awhull@hooverhullturner.com

Wayne C. Turner
HOOVER HULL TURNER LLP
wturner@hooverhullturner.com

Leonard Weintraub
PADUANO & WEINTRAUB, LLC
lweintraub@pwlawyers.com